PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 8/12/96**

TENTH CIRCUIT

————————

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 95-8039 |
| v. | ) | |
| | ) | |
| ARNOLDO ALFREDO RUIZ-CASTRO, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

————————

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 95-8040 |
| v. | ) | |
| | ) | |
| GENARO RUIZ-CASTRO, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

————————

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 95-8044 |
| v. | ) | |
| | ) | |
| ROSARIO ONECIMO RAMIREZ-PARA | ) | |
| aka "Lone Ramirez," | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

————————

Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 94-CR-77)

———

Daniel G. Blythe, of Rogers, Blythe & Lewis, Cheyenne, WY, for Defendant-Appellant
Arnoldo Alfredo Ruiz-Castro.

Timothy C. Kingston, of Graves & Associates, P.C., Cheyenne, WY, for Defendant-
Appellant Genaro Ruiz-Castro.

James H. Barrett, Assistant Federal Public Defender, Cheyenne, WY, for Defendant-
Appellant Rosario Onecimo Ramirez-Para.

David A. Kubichek, Assistant United States Attorney, Casper, WY (David D.
Freudenthal, United States Attorney, Wyoming, with him on the brief), for Plaintiff-
Appellee.

———

Before **EBEL**, **KELLY**, and **LUCERO**, Circuit Judges.

———

**EBEL**, Circuit Judge.

———

Defendants each were convicted of multiple charges arising out of a conspiracy to

transport cocaine to, and distribute cocaine in, the Rock Springs, Wyoming area.  On

appeal, Defendants Arnoldo and Genaro Ruiz-Castro together raise a number of

challenges to their convictions, including the alleged denial of their Sixth Amendment

right to a jury venire representing a fair cross-section of the community, to confront the

witnesses against them, and to testify at trial. Genaro also argues that there was insufficient evidence at trial to convict him of the charges against him, and his brother Arnoldo argues that the court abused its discretion by denying him the opportunity to take the deposition of his father who lives in Mexico. Furthermore, all three Defendants challenge various elements of their sentence. All three argue, and the government agrees, that the court impermissibly included in calculating their base offense level a quantity of cocaine which was unsubstantiated at trial. In addition, Arnoldo argues that the court improperly enhanced his sentence based on a prior conviction without affording him the opportunity for a colloquy as provided by 21 U.S.C. § 851(b); Genaro argues that the court unlawfully ordered him deported as a condition of supervised release; and Defendant Rosario Ramirez-Para argues that the court impermissibly included as relevant conduct for sentencing purposes certain transactions occurring before the commencement of the conspiracy, as well as a quantity of drugs with which he had no physical contact.

For the reasons stated below, we affirm the convictions of Genaro and Arnoldo. Regarding the sentencing issues, we agree that the court erred in estimating that the two brothers brought five ounces of cocaine to Wyoming in early or mid-June when the only witness testifying to this amount stated that he did not remember how much cocaine was involved in this transaction. Accordingly, we remand Genaro's and Arnoldo's sentences on this ground. Although the court made this same error in calculating Ramirez's drug quantity, we need not remand his sentence because subtracting the five ounces does not

change his offense level and because he was sentenced at the low end of the sentencing range for his offense level. We also agree with Genaro that the court erred in not engaging in the statutorily-prescribed colloquy before enhancing his sentence based on a prior offense and thus we remand Genaro's sentence on this ground as well. Regarding Arnoldo's and Ramirez's remaining sentencing issues, we affirm for the reasons stated below.

## Background

In April of 1994, Juan Garcia agreed to work as an undercover informant with respect to illegal drug distribution activities occurring in Sweetwater, Wyoming. An investigation of Garcia's criminal history background did not reveal any prior criminal history, either in the United States or in Mexico. However, the investigation did reveal that Garcia was illegally in the United States and was in possession of false and fraudulent social security and immigration documents. Nonetheless, Robert Mizel, a Sweetwater County Sheriff's Officer, enlisted Garcia as an informant for the Wyoming Division of Criminal Investigation.

One of the subjects of the investigations conducted through Garcia was Ramirez, whom Garcia befriended in May 1994. At the end of May 1994, Garcia approached Ramirez seeking to purchase cocaine from him, to which Ramirez agreed. On May 31, Garcia went to Ramirez's house after being provided with $1,500 in "buy funds" and a wireless transmitter from the police. Ramirez was not home at the time Garcia arrived,

but Ramirez's wife invited Garcia inside to wait for Ramirez. While waiting for Ramirez, one of Ramirez's customers, Becky Stroud, arrived at the house and waited with Garcia for Ramirez to return. Ramirez later returned home, accompanied by Arnoldo. Stroud and Ramirez went into another room in the house, at which point Ramirez delivered an eighth ounce of cocaine to her in exchange for $200.

While Ramirez and Stroud were in the other room, Arnoldo told Garcia that he lived in Phoenix, Arizona, discussed drugs with Garcia, and told Garcia that he was involved in cocaine trafficking and that he could get Garcia certain prices for cocaine in Phoenix. Following Stroud's departure, Ramirez, Arnoldo and Garcia went into Ramirez's bedroom. Ramirez took out a bag containing approximately a quarter kilogram of cocaine from the floor, took it into a closet area, and weighed out an ounce for Garcia.[1] Ramirez delivered the cocaine to Garcia, and Garcia paid the money to Ramirez. Arnoldo and Garcia talked further about Arnoldo obtaining more drugs in Phoenix, and Arnoldo promised to call Garcia with further information.

The following day, Ramirez came to Garcia's house to enlist Garcia's assistance in sending money to Arnoldo in Phoenix. Ramirez and Garcia went to a Western Union office, where Ramirez filled out the "send to" paperwork necessary to wire $2,300 to Phoenix. The name on the "send to" form, as well as the actual recipient of the money,

---

[1] At trial, Garcia specifically testified that he believed there was approximately a "grapefruit" sized amount of material in the bag and that Ramirez had told him the amount was one fourth kilogram.

was Genaro, who is Arnoldo's brother. The money itself consisted of drug proceeds Garcia earlier had assisted Ramirez in collecting from Ramirez's customers. Garcia also was present when Ramirez later made two additional Western Union wire transfers of further drug proceeds to Genaro, both of which were sent to and picked up by Genaro.

In addition to assisting Ramirez to send drug proceeds to Arnoldo via Genaro, Garcia had several telephone conversations with Arnoldo between June 1, 1994, and June 20, 1994. During the conversations, Garcia told Arnoldo that when Garcia came back from Phoenix, Ramirez wanted a quarter kilogram of cocaine and Garcia wanted a half kilogram of cocaine. Garcia testified that he knew Ramirez wanted a quarter kilogram of cocaine because he had previously talked to Ramirez about the amount.

In early or mid-June of 1994, Garcia went to Ramirez's house, where he again saw Arnoldo and was introduced to Genaro. During this meeting, Arnoldo indicated that he and Genaro had brought additional drugs to Rock Springs from Phoenix.[2] Arnoldo stated that he had to return to Phoenix, but that Genaro would stay in Rock Springs to collect money for the drugs as they were sold because the drugs brought on this trip belonged to Genaro.

---

[2] As discussed below, all three Defendants argue--and the government agrees--that no evidence was offered at trial regarding the amount of cocaine that Genaro and Arnoldo brought to Rock Springs in this trip. The only testimony Garcia offered regarding this amount was that he did not remember whether Arnoldo told him how much cocaine had been brought to Rock Springs on this trip. However, the court determined that Genaro and Arnoldo brought five ounces to Rock Springs during this trip, and sentenced the Defendants accordingly.

The following day, Genaro and Ramirez visited Garcia at Garcia's residence. Ramirez told Garcia that he and Genaro were going out to collect proceeds from the sale of the drugs Arnoldo and Genaro had just brought from Phoenix. After Arnoldo left to return to Phoenix, Genaro returned to Garcia's house alone to get a set of digital scales belonging to Ramirez, and Garcia accompanied Genaro to another house where the scales actually were located.

When Arnoldo returned to Rock Springs, he stayed with Genaro at the residence of Jose Alberta Villa-Lopez beginning June 19, 1994. On June 20, Arnoldo brought a paper bag containing cocaine into Villa-Lopez's trailer home. Also on the morning of June 20, Garcia visited Villa-Lopez's trailer in connection with a separate investigation of Villa-Lopez's heroin dealing that Garcia was working with Agent Mizel. In the presence of Genaro and Villa-Lopez, Arnoldo advised Garcia that he had brought another quarter kilogram of cocaine to Rock Springs. Garcia then left and returned around noon that day.

When Garcia returned around noon, Garcia, Arnoldo, Genaro and Villa-Lopez went into the back bathroom of the trailer, where Villa-Lopez measured the heroin which Garcia had come to buy. Arnoldo then retrieved some cocaine and brought it into the bathroom. The cocaine was packaged in small plastic bags contained in a larger bag and looked, to Garcia, to be about the size of a grapefruit. Arnoldo asked Garcia if he would purchase some of the cocaine, to which Garcia responded that he had to sell the heroin first. Garcia nevertheless requested a sample of the cocaine, and Arnoldo provided him

-7-

with a sample in a small sandwich bag. Garcia paid Villa-Lopez $4,500 of buy money that Agent Mizel had given Garcia to pay for the heroin, a portion of which Villa-Lopez gave to his wife, and the rest of which he gave to Genaro.

Later that day, Arnoldo, Genaro, Ramirez and Villa-Lopez all were arrested, and a search warrant was executed at Villa-Lopez's trailer. At the time of his arrest, Genaro was found to be in possession of $2,500 in buy funds used by Garcia to purchase heroin from Villa-Lopez. During the search of the trailer home, approximately 217 grams of cocaine were discovered above a kitchen cabinet, packaged in separate one-ounce quantities. Agents also found $1,000 of "buy money" that Garcia had given to Villa-Lopez for the heroin. Villa-Lopez's wife went to the police station on June 21 and delivered to Agent Mizel a package of cocaine which she had found that day in a waste basket in her bedroom.

The Defendants were convicted of the following offenses:

**Arnoldo.** Conspiracy to possess with intent to distribute and distribution of cocaine; distribution of cocaine and aiding and abetting; possession of cocaine with intent to distribute and aiding and abetting; and distribution of cocaine.

**Genaro.** Conspiracy to possess with intent to distribute and distribution of cocaine; possession of cocaine with intent to distribute and aiding and abetting; and money laundering and aiding and abetting.

**Ramirez.** Conspiracy to possess with intent to distribute cocaine; distribution of cocaine and aiding and abetting; money laundering and aiding and abetting.

Villa-Lopez pled guilty to the charges against him and did not participate in the trial of any of his co-defendants.

## I. The Alleged Trial Errors

A.     Right to a Venire Composed of a Fair Cross-Section

The court provided the venire list to Defendants on March 3, 1995--five days before the trial was to begin on March 8, 1995.  On March 6, after determining that few members of the venire had Hispanic surnames, counsel for Genaro filed a motion to obtain racial statistics on the jury pool, which the court granted on the following day.  The statistics showed that of the 165 possible jurors, only two identified themselves as Hispanic (1.2% of the venire) and none identified themselves as African-American.  Based on the State of Wyoming's 1993 Almanac, the percentage of Hispanics living in the four counties from which the venire was drawn were 9.9%, 6.45%, 8.7% and 4.96%.  The population of African Americans in those counties was 3.03%, .008%, .002% and .0006%.  On March 8, the morning of trial, Genaro filed a Motion to Dismiss Indictments or Stay of Trial for Improper Selection of Jury Venire.[3]  The district court denied the motion on the same day, holding that Genaro "did not attempt to show there had been any systematic exclusion of a distinctive group," as required by U.S. v. Robertson, 45 F.3d 1423, 1439 (10th Cir. 1995), cert. denied, 116 S. Ct. 133 (1995).

_____

[3]  Arnoldo did not raise this issue below, but he seeks to join Genaro in asserting this error on appeal.  Because he did not raise this issue below, we decline to address this issue as to Arnoldo.  However, since we reject the identical argument raised by Genaro, the outcome would not be different if Arnoldo had raised this issue below.

The Sixth Amendment grants a defendant the right to a jury pool comprised of a fair cross-section of the community. Id. To establish a prima facie violation of the Sixth Amendment fair cross-section requirement, the defendant must show: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. U.S. v. Edwards, 69 F.3d 419, 437 (10th Cir. 1995) (quoting Duren v. Missouri, 439 U.S. 357, 364 (1979)).

We do not believe that the district court erred in concluding that Genaro failed to establish the systematic exclusion element of the Duren test. Here, Genaro failed to allege any facts demonstrating that any underrepresentation of minorities in this particular venire was not merely a random episode of an otherwise competent jury selection system in the District of Wyoming. Furthermore, nothing in the record suggests that any underrepresentation resulted from a system of selecting prospective jurors that is inherently flawed at obtaining venires which fairly represent the ethnic breakdown of the community. In Duren, the Court found that the defendant had established systematic exclusion when he demonstrated that "a large discrepancy occurred not just occasionally, but in every weekly venire for a period of nearly a year" and defendant "established when in the selection process the systematic exclusion took place." 439 U.S. at 366. See also

-10-

Brown v. Lockhart, 781 F.2d 654, 657 (8th Cir. 1986) (remanding for an evidentiary hearing defendant's allegations that a jury selection system excluded blacks over a five year period and that the jury selection system was tainted by a deliberately exclusionary operation). Here, Genaro presented only statistics comparing a single jury venire to census statistics. Furthermore, although he summarily alleged that the disparity resulted from the District of Wyoming's reliance on voter registration lists to select the venire, Genaro failed to present any statistics or other proof that demonstrated how the use of voter registration lists systematically excludes a cognizable group in the district.

Federal courts generally have approved the use of voter registration lists to select the venire. See U.S. v. Rising, 867 F.2d 1255, 1260 (10th Cir. 1989); U.S. v. Afflerbach, 754 F.2d 866, 869-70 (10th Cir.), cert. denied, 427 U.S. 1029 (1985); U.S. v. Lewis, 10 F.3d 1086, 1090 (4th Cir. 1993). In order to challenge the use of voter registration lists successfully, a defendant would have to show that such use has the result of "systematically exclud[ing] a distinct, cognizable class of persons from jury service." Rising, 867 F.2d at 1260; Afflerbach, 754 F.2d at 870. It is not a sufficient defense, of course, merely to argue as the government does here, that voter registration lists can never be exclusionary so long as eligible voters of all races are equally allowed to register. That might be a defense to an equal protection challenge to the right to vote, but the issue before us is not that issue, but rather the issue of whether jurors are selected in a way that results in the systematic exclusion of a cognizable group. See Bryant v. Wainwright, 686

-11-

F.2d 1373, 1378 n.4 (11th Cir. 1982) (noting that "if the use of voter registration lists as the origin for jury venires were to result in a sizeable underrepresentation of a particular class or group on the jury venires, then this could constitute a violation of a defendant's 'fair cross-section' rights under the sixth amendment"), cert. denied, 461 U.S. 932 (1983). See generally Cynthia A. Williams, Note, Jury Source Representativeness and the Use of Voter Registration Lists, 65 N.Y.U. L. Rev. 590, 629 (1990). However, here Genaro simply fails to make an adequate showing that the use of voter registration lists had the result of systematically excluding a cognizable group of qualified jurors.

Genaro argues that if the district court had granted him a requested continuance, he would have been able to demonstrate systematic exclusion because they could have shown the manner by which using voter registration lists serves to severely underrepresent certain groups in Wyoming. However, here Genaro waited until the morning trial was scheduled to commence to request the continuance. At oral argument, counsel for Genaro conceded that the ethnic breakdown of the jury venire could have been available to him weeks before jury selection if he had requested it. Therefore, because Genaro could have obtained this information at a much earlier stage of the proceedings, we do not believe the court erred in refusing the continuance on the morning of trial when Genaro failed to allege any facts from which the court could conclude that they likely could establish systematic exclusion.[4]

---

[4] Genaro also argues that his rights were violated under the Jury Selection Act, 28

(continued...)

-12-

B.    Right to Confrontation

Arnoldo and Genaro argue that the court infringed their Sixth Amendment right to confrontation by granting a government motion in limine to limit cross-examination of Garcia and Agent Mizel.  Specifically, the court prohibited Defendants from cross-examining the witnesses regarding Garcia's alleged prior convictions in Mexico for drug offenses and prior acts of fraud or fraudulent statements allegedly made by Garcia.

Although the Sixth Amendment guarantees a criminal defendant the right to cross-examine witnesses, Davis v. Alaska, 415 U.S. 308, 315-17 (1974), "the extent of cross-examination with respect to any appropriate subject is within the sound discretion of the trial court."  U.S. v. Hinkle, 37 F.3d 576, 579 (10th Cir. 1994).  Therefore, trial court decisions excluding questions about a witness' prior criminal record are reviewable for abuse of discretion only, U.S. v. Linn, 31 F.3d 987, 991 (10th Cir. 1994), and should be set aside on appeal only if the trial court's decision reflects "an 'arbitrary, capricious, whimsical, or manifestly unreasonable judgment."  Hinkle, 37 F.3d at 579 (quoting Boren v. Sable, 887 F.2d 1032, 1033 (10th Cir. 1989)).

---

[4](...continued)
U.S.C. § 1861.  Section 1861 grants litigants "the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."  However, in determining whether a jury venire fails to meet the Section 1861 requirement, courts similarly require that the defendant demonstrate that the jury selection process systematically excludes a cognizable class.  See U.S. v. Afflerbach, 754 F.2d 866, 869-70 (10th Cir.), cert. denied, 472 U.S. 1029 (1985); Floyd v. Garrison, 996 F.2d 947, 949 (8th Cir. 1993).  Because we conclude that Genaro failed to demonstrate systematic exclusion, we reject his Section 1861 claim.

We find that the court did not abuse its discretion in limiting the cross examination of Garcia and Agent Mizel because Genaro and Alfredo failed to provide any evidentiary foundation that could have provided the court with a genuine belief that Garcia was convicted for drug transactions in Mexico or that he had made any fraudulent or false statements. "Unless the [examiner] is prepared to prove that there has been an undisclosed conviction which would be admissible under Rule 609, general questions" inquiring of past convictions should not be asked. U.S. v. Wolf, 561 F.2d 1376, 1382 (10th Cir. 1977).[5] Accordingly, courts require a "good faith" basis before permitting a party to cross examine regarding prior bad acts. See, for example, U.S. v. Ovalle-Marquez, 36 F.3d 212, 219 (1st Cir. 1994), cert. denied, 115 S. Ct. 1322 (1995). "While the purpose of cross-examination is to impeach the credibility of a witness, the basis for the impeachment cannot be speculation and innuendo with no evidentiary foundation." Id. "The general rule in such situations is that the questioner must be in possession of some facts which support a genuine belief that the witness committed the offense or the degrading act to which the questioning relates." U.S. v. Sampol, 636 F.2d 621, 658 (D.C. Cir. 1980) (quotation omitted).

Here, before ruling on the government's motion in limine, the court granted Defendants the opportunity to submit evidentiary proof of Garcia's alleged bad acts.

---

[5] Fed. R. Evid. 609 governs when a party may attack the credibility of a witness with evidence of a former conviction.

-14-

Despite this opportunity, Defendants failed to present to the district court any good-faith basis or evidence supporting such convictions or statements. Similarly on appeal, the Defendants do not point to any facts on which this Court could find that the district court's conclusion was arbitrary. Finally, the court permitted Defendants to cross examine the witnesses on a broad range of other subjects relating to Garcia's credibility.[6] Therefore, we find no violation of Genaro and Alfredo's Sixth Amendment right to confrontation.

C.    Right to Testify

Arnoldo and Genaro argue that the court denied them their constitutionally-protected right to testify at trial by denying them the opportunity to testify regarding Garcia's reputation.[7] The Supreme Court has recognized that the Constitution protects a defendant's right to testify on his own behalf at a criminal trial as "'essential to due process of law in a fair adversary process.'" Rock v. Arkansas, 483 U.S. 44, 51 (1987)

---

[6] For example, Defendants cross-examined Garcia concerning his illegal status; that he had purchased false identity documents; that Garcia used those documents to effectively lie to prospective employers about his immigration status; that he was hoping to receive favorable immigration treatment in exchange for his work as a police informant; that he had been paid in exchange for his assistance to law enforcement; and that he had not filed tax returns in the United States during a previous period when he was in the United States. The Defendants also examined Agent Mizel regarding several of these issues.

[7] Arnoldo and Genaro also allege that their rights were violated when the court denied them the opportunity to present witnesses. However, the only witnesses the brothers claim they were unable to present are themselves, who would testify regarding Garcia's reputation. Therefore, we do not address this argument separately from the argument that the court denied Defendants the opportunity to testify.

(quoting Faretta v. California, 422 U.S. 806, 819 n.15 (1975)).  Here, however, the court

did not deny Genaro and Arnoldo the opportunity to testify on their own behalf, but rather

prohibited them only from testifying regarding what they perceived to be Garcia's

reputation in Mexico.  Testimony concerning reputation is governed by Fed. R. Evid.

608(a), which provides:

> **(a)  Opinion and reputation evidence of character.**
> The credibility of a witness may be attacked or supported by evidence in the form
> of opinion or reputation, but subject to these limitations:  (1) the evidence may
> refer only to character for truthfulness or untruthfulness, and (2) evidence of
> truthful character is admissible only after the character of the witness for
> truthfulness has been attacked by opinion or reputation evidence or otherwise.

The admission of reputation evidence is left to the sound discretion of the district court.

U.S. v. Bedonie, 913 F.2d 782, 802 (10th Cir. 1990), cert. denied, 501 U.S. 1253 (1991).

Furthermore, in order to establish an appropriate foundation, a witness testifying under

Rule 608(a) "must show 'such acquaintance with the [person under attack], the

community in which he has lived and the circles in which he has moved, as to speak with

authority of the terms in which generally he is regarded.'"  Id. (quoting Cooper v.

Asplundh Tree Expert Co., 836 F.2d 1544, 1552 (10th Cir. 1988)) (alteration in original).

We again conclude that Defendants did not establish the requisite foundation in

order to offer reputation evidence.  Although Arnoldo, Genaro and Garcia are all from

Mexico, Defendants alleged no facts to suggest that they were personally acquainted or

familiar with Garcia or his alleged reputation for dishonesty.  Therefore, the trial court did

not abuse its discretion in prohibiting Defendants from testifying regarding Garcia's reputation.

### D.    Sufficiency of the Evidence Against Genaro

Genaro argues that the evidence at trial was insufficient to convict him of three of the charges against him:  (1) conspiracy to possess and distribute cocaine; (2) possession of cocaine; and (3) money laundering.  In reviewing a challenge to the sufficiency of the evidence, we review the record to determine only whether taking the evidence--both direct and circumstantial, together with reasonable inferences to be drawn therefrom--in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.  U.S. v. Williamson, 53 F.3d 1500, 1514 (10th Cir.), cert. denied, 116 S. Ct. 218 (1995).  To overturn a conviction on this ground, we must find that no reasonable juror could have voted to convict.  U.S. v. Hoenscheidt, 7 F.3d 1528, 1530 (10th Cir. 1993).  In conducting this review, we are not to reweigh the credibility of the witnesses, and we must accept the jury's resolution of conflicting evidence.  U.S. v. Sapp, 53 F.3d 1100, 1103 (10th Cir. 1995), cert. denied, 116 S. Ct. 796 (1996).

#### 1.    Conspiracy

In order to establish that Genaro was guilty of the cocaine conspiracy charged in this case, the government was required to prove that:  (1) there was an agreement between two or more persons to violate the federal drug laws; (2) Genaro had knowledge of the

essential objective of the conspiracy; (3) Genaro knowingly and voluntarily involved himself in the conspiracy; and (4) there was interdependence among the alleged conspirators. U.S. v. Johnson, 12 F.3d 1540, 1545 (10th Cir. 1993), cert. denied, 116 S. Ct. 139 (1995). Genaro does not dispute that the evidence was sufficient to establish the first element of a conspiracy. Instead, he argues primarily that the evidence as a matter of law does not demonstrate that he was involved in any conspiracy.

We disagree. The government provided an abundance of evidence from which a reasonable jury could find that Genaro knowingly participated in a conspiracy with Arnoldo and Ramirez including, but not limited to: Ramirez and Garcia wired drug proceeds to Genaro in Phoenix on several occasions, and Genaro picked up the wire transfer and cashed the checks he received; Arnoldo told Garcia that the drugs brought from Phoenix to Rock Springs belonged to Genaro and Genaro, who was present during this conversation, did not contradict the statement; Ramirez told Garcia, in Genaro's presence, that he and Genaro were on their way to collect proceeds from cocaine that Arnoldo and Genaro brought from Phoenix; later that day, Genaro returned to Garcia's house alone to get a set of digital scales; and at the Villa-Lopez residence on June 19 and 20, Genaro obtained a $2,500 loan from Villa-Lopez, which was needed apparently to pay for cocaine Arnoldo brought from Phoenix.[8]

---

[8] Genaro argues that the government failed to offer any evidence that Genaro was present at the Villa-Lopez house on June 20 or that Villa-Lopez had given any money to Genaro. However, Villa-Lopez's wife, Lula Villa, testified that both that Genaro was

(continued...)

Moreover, the evidence suggests that Genaro knowingly and voluntarily became a part of the conspiracy by assisting in the collection of drug funds by receiving wired drug money and by accepting money from Villa-Lopez to pay for drugs. Finally, Genaro's role appears interdependent with the other conspirators. While Ramirez appeared responsible for finding customers in Wyoming and Arnoldo apparently focused on obtaining supplies of cocaine from a source in Phoenix, Genaro was responsible for retrieving the proceeds wired down to Phoenix from Ramirez and assisted Ramirez in collecting proceeds from the sale of cocaine in Wyoming.

2.      Possession with Intent to Distribute

Genaro next argues that the court presented no evidence from which a reasonable jury could conclude that he possessed cocaine. Although there is little evidence that Genaro physically possessed any cocaine, there is more than sufficient evidence upon which a reasonable jury could conclude that Genaro was in constructive possession of cocaine that Arnoldo and Genaro transported into Wyoming. In U.S. v. Culpepper, 834 F.2d 879, 881 (10th Cir. 1987), we held that an individual constructively possesses property when he "knowingly hold[s] the power and ability to exercise dominion and control

---

[8](...continued)
present at the Villa-Lopez residence on June 20, and that after Garcia gave Villa-Lopez the $4,500 for the heroin, Villa-Lopez "gave some to Genaro, then handed me the rest of it." Although Lula did not testify how much Villa-Lopez gave to Genaro, the police discovered $2,500 of the money given to Garcia in Genaro's possession when they arrested Genaro.

over it."  Constructive possession of a narcotic is specifically defined as "an appreciable ability to guide the destiny of the drug."  U.S. v. Massey, 687 F.2d 1348, 1354 (10th Cir. 1982) (quotation omitted).  In order to establish constructive possession, the government must establish that there was a sufficient nexus between the accused and the drug.  Culpepper, 834 F.2d at 882.  Constructive possession may be established by circumstantial evidence and may be joint among several individuals.  Id.

In Massey, the defendant had participated in two nights of picking marijuana in Oklahoma.  687 F.2d at 1351.  Sacks of the drug had been loaded into one of two cars carrying the participants back to Missouri.  Police stopped and searched the two cars, and discovered marijuana in the car not driven by defendant.  We held that although there were no drugs in the car that defendant was driving, there was sufficient evidence of constructive possession to raise a question for the jury:

> In this case evidence was introduced showing that the trip was a cooperative venture, that Massey helped pick and load the marijuana, and that he was to receive a one fourth share.  Even though he was not driving the car in which the marijuana was found, the two vehicles were traveling together and maintained communication by CB radio.  The evidence was sufficient to permit the inference that a working relationship existed among the group members by which Massey had some appreciable ability to guide the destiny of the drug.

Id. at 1354 (quotation omitted).  See also U.S. v. Gallo, 927 F.2d 815, 822 (5th Cir. 1991) (stating that "when the evidence is sufficient to establish the defendant's participation in a conspiracy to possess illegal narcotics, the defendant will be deemed to possess narcotics through his co-conspirator's possession").

Here, there was evidence that Genaro traveled in the same car as the cocaine when he came to Wyoming with Arnoldo in early or mid-June, which presents an even stronger case for constructive possession than the situation in Massey. Furthermore, Arnoldo had told Garcia that the earlier shipment of drugs to Wyoming belonged to Genaro and Lula Villa testified that Genaro took money from Villa-Lopez to send to Phoenix to pay for cocaine. All this evidence indicates Genaro's dominion and control over cocaine, further establishing his constructive possession of cocaine.

3.    Money Laundering

Genaro also argues that the evidence was insufficient to support his money laundering conviction on Count Five. The basis for that count was that on June 17, 1994, Ramirez wired Genaro $500 using his wife's name rather than his own name as the sender in order to reduce the probability of attracting attention due to frequent transfers by the same sender. In order to maintain a charge of money laundering, the government must show that:  (1) the defendant took part in a financial transaction; (2) the defendant knew that the property involved in the transaction involved the proceeds of illegal activity; (3) that the property involved was in fact the proceeds of that illegal activity; and (4) the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, source, location, ownership, or control of the illegal proceeds. 18 U.S.C. § 1956(a)(1); U.S. v. Garcia-Emanuel, 14 F.3d 1469, 1473 (10th Cir. 1994). Specifically, Genaro argues that the government offered no proof that he knew the money being sent

was the proceeds of drug activity or that the transaction was designed to conceal the source of the illegal proceeds.

Again, we believe the evidence presented was such that a reasonable jury could conclude that Genaro was aware that the money was the proceeds of drug activity. Prior to the transfer that was the subject of the conviction, Genaro had participated in a conversation with Ramirez and Arnoldo concerning their drug activity, and Genaro had accompanied Ramirez during efforts to collect drug proceeds. A reasonable jury could therefore infer that Genaro knew that the money wired to him by Ramirez was the proceeds of drug activity. We also believe that the evidence was sufficient to suggest that Genaro knew the transaction was designed to conceal the nature and the source of the money involved. At trial, the government presented evidence that Genaro would have to know the name of the sender in order to acquire the money. Thus, Genaro would have to know that Ramirez sent the money under his wife's name, a fact that could reasonably suggest an attempt at concealment.[9]

_____

[9] Genaro argues that because the government charged him with three money laundering counts, and because the jury convicted him only of the count involving the June 17 transfer, the evidence must be insufficient to support the present conviction because the evidence was virtually the same regarding all three transfers except for the fact that Ramirez used his wife's name as the sender in the June 17 transfer. However, the fact that a jury considers evidence insufficient to support a conviction beyond a reasonable doubt on one count does not necessarily mean that similar evidence on another count is so insufficient that we could say that no reasonable jury could find the evidence sufficient to support a conviction. In any event, the jury might have acquitted Genaro of the other two counts because they believed there was insufficient evidence that Genaro knew these transactions were designed to conceal the nature of the transaction. In

(continued...)

-22-

E.    Court's Refusal to Permit Depositions of Arnoldo's Father

Arnoldo argues that the court abused its discretion by denying him the opportunity to depose telephonically his parents living in Mexico, who allegedly would testify that Arnoldo was in Mexico in early June, 1994--a time at which Garcia testified that Arnoldo was in Phoenix obtaining cocaine.   The district court denied Arnoldo the opportunity to depose his parents over the telephone because the court would not be able to confirm that the person speaking on the phone would testify truthfully because the witness could not be sworn under oath. The court did provide transportation for Arnoldo's mother, who came to the United States and testified at trial that she saw Arnoldo in Mexico from June 9 to June 15, 1994.  However, because Arnoldo's father is an invalid and could not travel to the United States, the father's alibi testimony was not presented at trial.

We do not believe the district court erred in refusing the telephonic depositions because Arnoldo's proposal did not satisfy Fed. R. Civ. P. 28(b)'s procedures regarding depositions taken in foreign countries and because Arnoldo did not demonstrate exceptional circumstances existed warranting the taking of depositions.  First, under Fed. R. Crim. P. 15(d), depositions in criminal cases are to be taken in the same manner provided

---

[9](...continued)
contrast with the June 17 transaction, the fact that Ramirez used his wife's name could suggest that Genaro knew the transaction was designed to conceal the nature and source of the illegal proceeds.

-23-

for in civil actions.[10]  Fed. R. Civ. P. 30(b)(4) states that depositions "shall be conducted before an officer appointed or designated under Rule 28...."  Rule 28(b), in turn, provides that depositions:

> may be taken in a foreign country (1) pursuant to any applicable treaty or convention, or (2) pursuant to a letter of  request (whether or not captioned a letter rogatory) or (3) on notice before a person authorized to administer oaths in the place where the examination is held, either by the law thereof or by the law of the United States, or (4) before a person commissioned by the court, and a person so commissioned shall have the power by virtue of the commission to administer any necessary oath and take testimony.

Here, Arnoldo's proposal for a telephone deposition failed to satisfy any of these requirements.  In his motion, Arnoldo neither referenced any treaties nor did he state that his father would testify "before" a person authorized to administer oaths as described in Rule 28(b).  See U.S. v. Tolliver, 61 F.3d 1189, 1206 (5th Cir. 1995) (affirming district court's refusal to permit telephonic deposition from ship when the court was unaware of

---

[10]  Fed. R. Crim. P. 15 governs the use of depositions in a criminal trial, and provides in relevant part:

> **(a)  When taken.**  Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition….

> ….

> **(d)  How taken.**  Subject to such additional conditions as the court shall provide, a deposition shall be taken and filed in the manner provided in civil actions except as otherwise provided in these rules….

any person authorized to administer the requisite oath and there was no way for the government to verify the identification and reliability of the deponent), vacated and remanded on other grounds sub nom. Sterling v. U.S., 116 S. Ct. 900 (1996). Furthermore, the government researched the applicable treaties with Mexico governing depositions and determined that it could take several months under the relevant treaty to order such a deposition in Mexico. At the same time, Arnoldo filed this motion five weeks before trial and refused to accede to any delay in the trial. Therefore, the court did not err in denying Arnoldo the opportunity to take his parents' deposition over the telephone because Arnoldo did not propose how the depositions could be taken consistently with procedural rules.

Second, Arnoldo failed to meet his burden of proving that exceptional circumstances existed justifying the taking of the deposition as required by Fed. R. Crim. P. 15(a). See U.S. v. Drogoul, 1 F.3d 1546, 1552-53 (11th Cir. 1993) (placing burden on proponent of depositions to satisfy Rule 15(a)). Arnoldo argues that Rule 15(a) was satisfied because: (1) his parents' testimony was material; (2) his parents would be unable to testify at trial; and (3) taking the deposition was necessary to prevent a failure of justice. See U.S. v. Fuentes-Galindo, 929 F.2d 1507, 1509 (10th Cir. 1991) (considering these factors in part to decide whether the exceptional circumstances test was met). Although Arnoldo's parents' alibi testimony likely can be considered material, the government points out that Arnoldo made no showing that his parents were unable to attend

his trial.  In fact, his mother did travel to the United States to offer her alibi testimony at trial.  Regarding Arnoldo's father, Arnoldo offered no proof that his father was unable to travel to the United States other than Arnoldo's statement that his father was an invalid too ill to travel.  See Fuentes-Galindo, 929 F.2d at 1510 (requiring that proponent make some showing that witness would be unavailable to testify at trial); Drogoul, 1 F.3d at 1553 (holding that proponent may demonstrate unavailability of a prospective deponent through affidavits or otherwise).  We therefore agree with the district court that Arnoldo failed to meet his burden that exceptional circumstances justified the taking of his parents' deposition in Mexico.[11]

We also note that the purported deposition testimony of Arnoldo's father would have been duplicative of his mother's testimony at trial.  Arnoldo's mother testified that Arnoldo was in Mexico from roughly June 9, 1994 through June 15, 1994.  Arnoldo's father's purported testimony personally would have been identical.  Furthermore, as one of Arnoldo's parents, his father would have been subject to the identical credibility attack as his mother.  Finally, the court offered Arnoldo the opportunity to identify someone else in Mexico who could testify to his presence there in June of 1994.  If Arnoldo identified such a person, the court suggested they could be transported to the United States to

---

[11]  Arnoldo also asked the court to permit his attorney, at the court's expense, the opportunity to fly to Mexico to depose his father if it did not permit the telephonic deposition.  On appeal, however, Arnoldo does not make any arguments suggesting the court abused its discretion in denying such a request other than a general reference to the Criminal Justice Act, and we find no such abuse of discretion.

support Arnoldo's mother's testimony. Arnoldo, however, was unable to locate anyone else in Mexico who could testify to his presence there during the relevant period.

## II. The Alleged Sentencing Errors

All three Defendants also appeal various aspects of their sentence. We review the district court's factual findings only for clear error, giving due deference to the district court's application of the guidelines to the facts. U.S. v. Torres, 53 F.3d 1129, 1142 (10th Cir.), cert. denied, 115 S. Ct. 2599 (1995). Accordingly, drug quantity determinations by a sentencing court are reviewable for clear error. U.S. v. Nieto, 60 F.3d 1464, 1469 (10th Cir. 1995), cert. denied, 116 S. Ct. 793 (1996). The quantum of proof necessary to support a drug quantity determination is a preponderance of the evidence. In carrying its burden, the government is not limited in its proof to only those drugs the defendant personally handled or with which he was personally involved. U.S. v. Williams, 897 F.2d 1034, 1041 (10th Cir. 1990), cert. denied, 500 U.S. 937 (1991). When the actual drugs underlying a drug quantity determination are not seized, the trial court may rely upon an estimate to establish the defendant's guideline offense level, "so long as the information relied upon has 'some basis of support in the facts of the particular case, and bears 'sufficient indicia of reliability.'" U.S. v. Wacker, 72 F.3d 1453, 1477 (10th Cir. 1995), quoting U.S. v. Garcia, 994 F.2d 1499, 1508 (10th Cir. 1993)), petition for cert. filed, No. 95-9284 (June 10, 1996).

A.      Genaro's Claims

1.      Drug Quantity

The court sentenced Genaro based on 620.75 grams of cocaine.  In reaching this figure, the court included 250 grams of cocaine that Garcia observed at Ramirez's house on May 31, 1994 and 141 grams (or five ounces) that Arnoldo and Genaro allegedly brought to Rock Springs in early or mid-June, 1994.  Genaro challenges the inclusion of both of these quantities.

First, regarding the 250 grams, Garcia testified that he saw a "grapefruit sized" amount of cocaine at Ramirez's house on May 31, 1994.  He also testified that Ramirez himself told Garcia that this amount represented a "fourth of a kilo" quantity of cocaine. Stroud further testified that she saw at Ramirez's house a few days later a "humongous white rock" of cocaine about the size of a "medium-size orange."  Garcia's testimony that Ramirez told him the amount of cocaine was one-fourth kilogram, combined with Garcia's description of the amount, suggests that the court's estimation of a quarter kilogram possesses sufficient indicia of reliability to support the quantity.[12]  See U.S. v.

_____

[12]  The government points out that the estimation is further corroborated by the fact that Garcia in a separate situation accurately estimated a "grapefruit-sized" amount of cocaine to be one quarter kilogram of cocaine.  On Garcia's second June 20 visit to Villa-Lopez's residence, Garcia saw an amount of cocaine he said was about the size of a grapefruit.  After arresting the Defendants, the police seized very close to a quarter kilogram of cocaine--specifically, 227.5 grams of cocaine--suggesting that Garcia's account of the earlier amount of cocaine as being "grapefruit sized" also meant the first amount similarly was one quarter kilogram.

<u>Beaulieu</u>, 893 F.2d 1177, 1181 (10th Cir.) (noting that reliable hearsay may be used at sentencing to determine the appropriate punishment), <u>cert. denied</u>, 497 U.S. 1038 (1990).

Second, regarding the five ounces, Genaro, Arnoldo, Ramirez and the government agree that the trial court's finding of this quantity was clearly erroneous.  At trial, the government asked Garcia whether Arnoldo told Garcia how much cocaine Arnoldo and Genaro had brought to Rock Springs during the early or mid-June delivery.  Garcia replied, "I don't remember."  The presentence report, however, noted that Garcia testified the amount brought to Rock Springs was five ounces.  At the same time, the probation officer did not recommend including this amount in Defendants' relevant drug quantities because the amount "was not described precisely and the substance was -- never came into the custody of DCI."  During sentencing proceedings, the government stated that, "[a]s I recall his testimony, [Garcia] described contacting Agent Mizel after he had seen Genaro and Alfredo in the middle of town in Rock Springs and that Alfredo had told him at that time that he was back in town and that he had brought five ounces with him."  The government also stated at sentencing that although it did not "have those five ounces before me, … they were testified to."  The court apparently relied on the reference to five ounces in the presentence report and  the government's argument at sentencing, as it included the five ounces in calculating the three Defendants' drug quantities.

Having reviewed the record ourselves, we agree with the Defendants and the government that the district court's estimation of five ounces lacks sufficient indicia of

reliability, as the trial transcript reveals that Garcia testified he did not know whether Arnoldo told him how much cocaine the brothers had brought to Rock Springs on this occasion. The subtraction of 141 grams reduces Genaro's drug quantity to approximately 479 grams, which corresponds to an offense level of 24--two levels less than the level under which the court sentenced Genaro. Accordingly, we must remand Genaro's sentence for resentencing.

2.    Deportation

Genaro also argues that the district court improperly ordered as a condition of supervised release that he be delivered to immigration officials and that he be deported from the United States pursuant to 18 U.S.C. § 3583(d). He argues that the district court lacked authority to order deportation because such authority rests solely with the Immigration and Naturalization Service.[13] We recently held that Section 3583(d) does not grant district courts authority to deport a defendant-alien as a condition of supervised release, but rather that the provision authorzes district courts to impose as a condition of supervised release that a defendant be delivered to immigration officials for deportation proceedings consistent with the Immigration and Naturalization Act ("INA"), 8 U.S.C. §§ 1101-1524. See U.S. v. Phommachanh, No. 95-3248, 1996 WL 420780 (10th Cir.

---

[13] Section 3583(d) provides that "[i]f an alien defendant is subject to deportation, the court may provide, as a condition of supervised release, that he be deported and remain outside the United States, and may order that he be delivered to a duly authorized immigration official for such deportation."

July 26, 1996).  However, the district court did not exceed its authority under Section 3583(d) here because the court did not order Genaro deported as a condition of his supervised release.  Instead, it is apparent from the transcript of Genaro's sentencing hearing that the court ordered only that Genaro be delivered to officers at the Immigration and Naturalization Service as a condition of supervised release, who will decide whether Genaro should be deported.[14]  Therefore, the court did not usurp the authority of the INS simply by ordering that Genaro be referred to INS officials as a condition of supervised release.

---

[14]  Specifically, the court stated:

> The Court examines the language [of the statute.]  If an alien defendant is subject to deportation, the Court may provide as a condition for supervised release that he be deported or remain outside the United States and may order that he be delivered to duly authorized immigration officials for such deportation.  <u>I don't think my determination in this matter represents a determination of deportation, but rather that matter always falls within the appropriate jurisdiction of the Immigration and Naturalization Service in the first instance</u> subject to review, of course, by court action.
>
> And I would not intend to deprive Mr. Ruiz-Castro of his opportunity to seek to be relieved from my possible deportation action that may be initiated against him, rather that he fully comply with any orders that may be issued for his deportation and, if deported, shall remain, as a condition of supervised release, outside the presence of the United States.

(23 R.O.A. 17-18) (emphasis added.)

B.      Arnoldo's Alleged Errors

1.      Drug Quantity

Arnoldo argues, like Genaro, that there was no evidence to support the court's conclusion that he brought five ounces of cocaine to Wyoming with Genaro sometime in early or mid-June, 1994. Again, we agree that the estimation of five ounces lacks sufficient reliability for the reasons stated above. As with Genaro, subtracting the five ounces lowers Arnoldo's base offense level from level 26 to level 24.[15] Accordingly, we must remand Arnoldo's sentence for resentencing.

2.      Failure to Follow Section 851(b)

Prior to the commencement of trial, the government filed an information stating its intention to seek a sentence enhancement pursuant to 21 U.S.C. § 841(b) on the basis of a prior felony drug conviction. Arnoldo argues that during sentencing, the court failed to follow 21 U.S.C. § 851(b)'s requirement that before enhancing a sentence pursuant to Section 841(b), the court must personally inquire of the defendant whether he affirms or denies the prior conviction, and the court must personally advise the defendant that "any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence." Section 851(b). Both Arnoldo and the gov-

---

[15] In sentencing Arnoldo, the court adopted the presentence report's recommendation that Arnoldo be sentenced based on approximately 466 grams of cocaine, resulting in a base level of 24. However, the court also added 141.75 grams of cocaine--the disputed five ounces--which was not recommended in the presentence report, and which raised Genaro's offense level to 26.

ernment agree that because the court failed to follow Section 851(b)'s mandate, we should remand for resentencing.

We review a court's failure to follow Section 851(b)'s procedural requirements for harmless error. U.S. v. Gonzalez-Lerma, 71 F.3d 1537, 1540-41 (10th Cir. 1995), cert. denied, 116 S. Ct. 1341 (1996). We have held as harmless a judge's failure to inform a defendant of his opportunity to challenge his prior conviction during sentencing when the defendant sua sponte sought a continuance to research whether he could challenge the conviction and then concluded no grounds existed upon which he could challenge it. Id. at 1541. We concluded that "the fact that [defendant] decided no grounds existed upon which he could challenge his prior conviction indicates that any challenge [during sentencing] would have been futile." Id. In contrast in the present case, we cannot conclude either that Arnoldo appreciated his ability to challenge the prior conviction for sentencing purposes or that any challenge to the prior conviction would have been futile. Accordingly, the court's error cannot be considered harmless and on remand we order the court to engage in the Section 851(b) colloquy prior to enhancing Defendant's sentence.

C.    Ramirez's Alleged Errors

Finally, Ramirez argues that the court improperly calculated the drug quantity used to decide his sentence. The court sentenced Ramirez based on an offense level of 28 and

a drug quantity of 694.25 grams of cocaine.[16]  Ramirez argues that three amounts were improperly included in the calculation of this amount:  (1) 31 grams sold to Becky Stroud between April 1, 1994 and May 11, 1994;[17] (2) 227.5 grams seized from the Villa-Lopez residence and turned over by Lula Lopez; and (3) the 141.75 grams (5 ounces) Genaro and Arnoldo allegedly brought to Rock Springs in early or mid-June.

       1.      The Stroud Transactions Prior to the Conspiracy

In deciding to include the 31 grams from the Stroud transactions prior to May 14 as relevant conduct, the court noted that these transactions were not taken in furtherance of the jointly undertaken criminal activity.  The court nevertheless considered them to be relevant conduct because they "simply differ[ed] from that conduct that is chargeable or may be relayed against the other defendants."  Ramirez argues that because he was not engaged in illegal activity with Arnoldo and Genaro until May 14, 1994, any transactions occurring before that date cannot be considered relevant conduct because the activities could not have been either jointly undertaken or in furtherance of jointly undertaken activity.

---

[16]  The base offense level for offenses involving more than 500 grams but less than 2 kilograms of cocaine is 26.  U.S.S.G. § 2D1.1(c)(7).  Ramirez's base offense level was raised by two levels for committing an offense involving a stolen firearm under U.S.S.G. § 2K2.1(b)(4).

[17]  Although the presentence report calculated that Ramirez delivered a total of 73.5 grams of cocaine to Stroud, Ramirez challenges only the inclusion of the 31 grams he delivered to Stroud before May 14, when he became involved in the conspiracy with Arnoldo and Genaro.

U.S.S.G. § 1B1.3(a)(2) provides that the base offense level shall be determined based on "all acts and omissions … that were part of the same course of conduct or common scheme or plan as the offense of conviction."[18]  See also U.S. v. Roederer, 11 F.3d 973, 978 (10th Cir. 1993); U.S. v. Smith, 929 F.2d 1453, 1459 (10th Cir.), cert. denied, 502 U.S. 847 (1991).  In 1992, the Sentencing Commission amended the guidelines to provide definitions for "common scheme or plan" and "course of conduct."  See U.S.S.G. § 1B1.3, comment n.9.  Section 1B1.3 defines "same course of conduct" as follows:

> Offenses … may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.  Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.  When one of the above

---

[18]  Specifically, Section 1B1.3(a)(2) provides that:

solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above [which involve all acts committed by the defendant and all reasonable foreseeable acts of joint criminal activity] that were part of the same course of conduct or common scheme or plan as the offense of conviction.

Section 3D1.2 requires that a court group "[a]ll counts involving substantially the same harm," and accordingly provides for grouping together of all counts charging offenses of a similar type.  U.S.S.G. § 1B1.3 (background).  However, the applicability of Section 1B1.3(a)(2) does not depend upon whether multiple counts are alleged; thus, in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction.  Id.

-35-

factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity....

Id. § 1B1.3, comment n.9.

The government argues that Ramirez's distribution of drugs to Becky Stroud prior to his association with Genaro and Arnoldo was part of the same course of conduct as the convicted offense against him because the only distinction to the former and latter transactions was Ramirez's source of cocaine. We agree. The pre-conspiracy deals to Stroud are similar to the post-conspiracy deal to Stroud as they involved similar amounts of the same substance (1/8 to 1/4 ounce of cocaine per transaction), occurred at either Stroud's house or at Ramirez's residence, and were regular, occurring one to three times a week. Moreover, the eight-week time period of deals to Stroud extended into the time when Ramirez dealt cocaine obtained from Genaro and Arnoldo. As the government states, the only thing that changed over this eight week period of time was Ramirez's source of supply: initially, it was persons other than Genaro and Arnoldo; after May 14, 1994, it was Genaro and Arnoldo. Therefore, we consider the transactions before May 14 sufficiently related to the transactions after May 14 to warrant the conclusion that they were part of an ongoing series of offenses and accordingly qualify as relevant conduct.

2.      Cocaine obtained from the Villa-Lopez residence

Ramirez argues that the court improperly used the 227.5 grams seized from the Villa-Lopez residence and from Lula Villa in its calculation of drug quantity because

there was no evidence that Ramirez had any direct connection with that amount. U.S.S.G.

§ 1B1.3 includes within the scope of relevant conduct:

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity….

Id. § 1B1.3(a)(1)(B). Accordingly, a defendant is responsible both for the drugs with which he was directly involved and for all reasonably foreseeable drug quantities that were within the scope of the conspiracy in which he was a member. Id., comment n.2; U.S. v. Sloan, 65 F.3d 861, 865 (10th Cir. 1995), cert. denied, 116 S. Ct. 824 (1996).

We have rejected the argument that a defendant involved in an ongoing criminal enterprise is responsible only for the actual quantity which the government proved the defendant personally handled. U.S. v. Williams, 897 F.2d 1034, 1041 (10th Cir. 1990). See also U.S. v. Torres, 53 F.3d 1129, 1144 & n.15 (10th Cir. 1995) (noting that "[a]bsent any affirmative withdrawal, [a defendant remains] part of the ongoing criminal enterprise.") (quotation omitted). Here, not only did Ramirez fail to take affirmative steps to disassociate himself from the cocaine distribution conspiracy, the evidence suggests that he continued to actively participate in the conspiracy when Genaro and Arnoldo brought the drugs in question to Wyoming.

Garcia testified that Ramirez spoke to Arnoldo frequently by telephone and discussed Ramirez's desire to obtain a further delivery of one quarter kilogram of cocaine just prior to when the brothers brought cocaine from Phoenix to Villa-Lopez's residence.

-37-

Ramirez wired money to Arnoldo and Genaro on June 17--two days before the brothers returned to Wyoming with this load of cocaine--and advised Garcia that he was using his wife's name as the sender and going to a different Western Union outlet in order to avoid anyone becoming suspicious of his activities. Garcia testified that he had relayed a message from Ramirez to Arnoldo over the phone that Ramirez was in need of a quarter kilogram of cocaine. Agent Young testified that Villa-Lopez told Young that he was informed by Genaro and Arnoldo that half of the cocaine brought to his residence was destined for Ramirez. Furthermore, Ramirez called the Villa-Lopez residence on the morning of June 20--the day the cocaine was seized--to talk to Genaro and Arnoldo. Based on these facts, we believe that the evidence not only supports the inference that the cocaine Genaro and Arnoldo brought to Villa-Lopez's house was brought in furtherance of the conspiracy and was reasonably foreseeable in connection with that criminal activity, but also suggests that Ramirez was involved directly with that amount.

3. The Five Ounces Brought to Rock Springs in Early June

Finally, Ramirez raises the same insufficiency of the evidence argument regarding the five ounces of cocaine Arnoldo and Genaro allegedly brought to Rock Springs in early or mid-June. Although we recognize the error, the error was harmless to Ramirez because the additional five ounces did not affect his sentence. Subtracting 141 grams from the 694.25 grams used to sentence Ramirez results in a drug quantity of 550 grams, which does not change Ramirez's offense level of 28. Furthermore, Ramirez was

sentenced to 78 months imprisonment--the lowest end of the applicable guideline range of 78 to 97 months. Therefore, the court's inclusion of the five ounces was of no consequence to Ramirez's sentence.

## Conclusion

For the foregoing reasons, we AFFIRM the convictions of Genaro and Arnoldo. We REMAND Genaro and Arnoldo's sentences for resentencing without the five ounces the brothers allegedly brought to Rock Springs in early June 1994 and we REMAND Arnoldo's sentence for the court to engage in the Section 851(b) colloquy before imposing an enhanced sentence. We AFFIRM Genaro's sentence on all other grounds. Finally, we AFFIRM Ramirez's sentence on all grounds.