**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 2 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

MICHAEL WAYNE REED,

    Defendant-Appellant.

No. 99-2150
(D. N.M.)
(D.Ct. No. CR-98-177)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **BRORBY**, **EBEL**, and **KELLY**, Circuit Judges.

_____

Appellant Michael Wayne Reed appeals his sentence following his guilty

plea to conspiracy to manufacture and possess, with intent to distribute,

methamphetamine. On appeal, Mr. Reed raises issues on the reliability of the

evidence supporting the district court's drug quantity determination and

application of a two-level firearm enhancement in calculating his sentence. Mr.

Reed's appeal also raises sentencing issues based on the United States Supreme

_____

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000).  We exercise our jurisdiction under 28 U.S.C. 1291 and affirm.


## I.  BACKGROUND

On February 25, 1998, federal drug enforcement agents arrested Mr. Reed, Bree Anne McClesky, and James Michael Cousert in Truth or Consequences, New Mexico, following an investigation into their manufacture of methamphetamine. Agents arrested Ms. McClesky and Mr. Cousert in a motel room, and later that same day, arrested Mr. Reed at a convenience store.  When arresting Mr. Cousert and Ms. McClesky in the motel room, agents found more than ten grams of methamphetamine, and large quantities of ingredients and equipment used to manufacture methamphetamine.  At the time of Mr. Reed's arrest, agents found a key to the motel room and small amounts of methamphetamine residue in the backpack he wore, his .45 mm. caliber pistol on the front seat of his car, and various ingredients and equipment used to make methamphetamine in his car trunk.  Agents later searched Mr. Reed's residence, again discovering various ingredients and equipment used to make methamphetamine, as well as a .9mm handgun.


On March 18, 1998, a grand jury returned a two-count indictment against

all three individuals.  Count I charged them with a conspiracy to manufacture and possess with intent to distribute less than ten grams of methamphetamine, and aiding and abetting, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846, and 18 U.S.C. § 2.  Count II charged them with possession with intent to distribute less than ten grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2.  On May 27, 1998, the grand jury returned a two-count superseding indictment against the three defendants, which included the same two counts as before, but for the first time identified the period of the conspiracy from January 15, 1997 to February 26, 1998, increased the amount of methamphetamine in Count I from less than ten grams of methamphetamine to 100 grams or more of  methamphetamine, and changed the applicable penalty statute from 21 U.S.C. § 841(b)(1)(C) to § 841(b)(1)(A).

Ms. McClesky and Mr. Cousert pled guilty to Count II of the superseding indictment.  Mr. Reed pled guilty to Count I, the conspiracy count in the superseding indictment, in exchange for the government dismissing Count II.  As part of the plea agreement, Mr. Reed waived his right to trial by jury, but disagreed he was accountable for 100 grams or more of methamphetamine as charged in Count I.  Instead, Mr Reed agreed the district court could determine the quantity of methamphetamine attributable to him after presentation by both

parties of evidence at the sentencing hearing.

Prior to the sentencing hearing, the United States Probation Officer (Probation Officer) prepared a presentence report, finding 7.07 kilograms of a methamphetamine mixture attributable to Mr. Reed under the conspiracy count.[1] Based on this finding, the Probation Officer recommended a base offense level of 36 under United States Sentencing Guideline § 2D1.1(c)(2),[2] and enhancing the base offense level by two levels under § 2D1.1(b)(1) for Mr. Reed's possession of a handgun. Furthermore, the Probation Officer recommended reducing the base offense level by two levels for Mr. Reed's admission to participating in a conspiracy under § 3E1.1(a) and one level for his cooperation under § 3E1.1(b)(1). Applying the resulting total offense level of 35 and a Criminal History Category of I, the Probation Officer recommended a sentence range of

---

[1] Because one kilogram is equivalent to 1,000 grams, 7.07 kilograms is 7,070 grams.

[2] Under the 1999 Drug Quantity Table, contained in U.S.S.G. § 2D1.1(c)(2), an offense level of 36 is prescribed for either: 1) a quantity of methamphetamine "mixture" of at least five, but less than fifteen kilograms, or 2) at least one, but less than three kilograms of "actual" (or "pure") methamphetamine. *See* U.S.S.G. § 2D1.1(c)(2)(1998); *see also United States v. Gigley*, 213 F.3d 509, 518-19 (10th Cir. 2000). In this case, the Probation Officer based the offense base level of 36 on the quantity of the methamphetamine "mixture," rather than the quantity of "pure" methamphetamine initially produced.

168 to 120 months in prison pursuant to the applicable Sentencing Table. *See* U.S.S.G. Chapter 5, Part A (Sentencing Table). In Mr. Reed's objections to the presentence report, he explicitly objected to the Probation Officer's application of the firearm enhancement and drug quantity determination in calculating his base offense level at 36.

At the sentencing hearing, the government introduced Mr. Cousert's and Ms. McClesky's inculpatory statements made to Drug Enforcement Agent Mark Payne, and which implicated Mr. Reed in the conspiracy. In addition, Mr. Cousert testified, stating he purchased the pseudoephedrine tablets Mr. Reed used to manufacture methamphetamine. More importantly, Mr. Cousert admitted he attended five "cooks" conducted by Mr. Reed. On this subject, the district court entered into the following colloquy with Mr. Cousert:

> THE COURT: You also say [in your statement to Agent Payne] "On each cook, Reed would make a total of two pounds of pure methamphetamine. After the cook was completed and they had finished the product, Reed would cut it with vitamin B at a ratio of two pounds of cut to one pound of crank. This made a total of six pounds of crank after each cook."
>
> Is that a correct statement?
>
> [MR. COUSERT]: Yes, Your Honor.
>
> THE COURT: So you saw him, on five times, make two pounds of methamphetamine?

[MR. COUSERT]: I don't know if exactly each time. Maybe a couple of them was one pound. But, yes, Your Honor.

THE COURT: Okay.

[MR. COUSERT]: That's just guesstimated.

While Mr. Cousert did not testify to the specific dates on which he witnessed the five "cooks," he explicitly said in his statement to Agent Payne that these "cooks" occurred between August 1997 and the date of his arrest on February 25, 1998.

In addition, Mr. Cousert testified that during the time of the subject "cooks," he considered himself an addict, used lots of drugs including methamphetamine and cocaine, and got high "just about every day". Mr. Cousert also stated he retained "a pretty good, clear memory" even when high on drugs, and insisted he remained coherent and off of drugs for approximately seven months prior to making his statement to Agent Payne. Mr. Cousert also testified Mr. Reed usually carried a gun to protect his money and drugs.

Agent Payne also testified at the sentencing hearing. Agent Payne verified Mr. Cousert told him Mr. Reed conducted five "cooks" from August 1997 until his arrest, which produced two pounds of pure methamphetamine Mr. Reed "cut" at a two-to-one ratio with vitamin-B. Although Ms. McClesky did not testify at the sentencing hearing, Agent Payne testified about the statement she made to

-6-

him. Specifically, Agent Payne testified that Ms. McClesky admitted being present at a "cook" where Mr. Reed manufactured two pounds of pure methamphetamine. In her statement, Ms. McClesky said the "cook" she attended occurred in December 1997. She also admitted she was assisting Mr. Cousert and Mr. Reed in preparing for a "cook" on the day of her arrest.

Finally, the Probation Officer testified on the presentence report she prepared. She explained she relied on the information Agent Payne provided to her, including the statements made by Mr. Cousert and Ms. McClesky, in finding 7.07 kilograms of mixed methamphetamine attributable to Mr. Reed and recommending the firearm enhancement.

At the conclusion of the sentencing hearing, the district court made explicit findings, stating:

> I find by a preponderance of the evidence that the presentence report is correct that there's seven kilograms of methamphetamine. I've given it rigorous scrutiny, I've watched the one witness testify, I've watched Agent Payne testify, and I find him to be totally credible. And your witness has testified – Mr. Cousert, although he was a drug addict, he seems to remember fairly well as to what happened. It's also corroborated by the statement that was given by Bree McClesky to Agent Payne."

The district court then adopted the factual findings and guideline applications in the presentence report, and sentenced Mr. Reed to a term of 168 months (or

fourteen years) in prison.

## II. DISCUSSION

On appeal, Mr. Reed raises three issues for review. First, he argues the drug quantity evidence presented at the sentencing hearing lacks a sufficient indicia of reliability for the purpose of determining his base offense level at 36. Second, Mr. Reed challenges the sufficiency of the evidence supporting his firearm enhancement. Finally, Mr. Reed contests the constitutionality of his sentence under the United States Supreme Court's decision in *Apprendi v. New Jersey*. We discuss each issue in turn.

### A. Reliability of Evidence on the Quantity of Methamphetamine

The crux of Mr. Reed's appeal centers on his claim the drug quantity evidence presented at the sentencing hearing did not contain "a sufficient indicia of reliability" required under U.S.S.G. § 6A1.3, for the purpose of determining his base offense level of 36. In support, Mr. Reed challenges the district court's reliance on Mr. Cousert's testimony because he: 1) was a heavy methamphetamine user and provided contradictory and unreliable information;[3] 2)

_____

[3] Mr. Reed raises this same contention about Ms. McClesky. In her statement, Ms. McClesky admitted she used methamphetamine since the age of sixteen, and purchased one to two ounces from Mr. Reed between 1994 through 1998. However, Mr.

-8-

offered testimony that did not ascertain a specific quantity of methamphetamine; and 3) did not provide sufficient information narrowing the time-frame when Mr. Reed manufactured the methamphetamine. Thus, Mr. Reed asserts the district court improperly relied on "the contradictory guesstimates of an addict-informant."

Mr. Reed also suggests the district court failed to make required findings on whether: 1) Mr. Cousert's drug use affected his memory to any degree; 2) Mr. Cousert or Mr. Reed "cut" the methamphetamine with vitamin B; 3) Mr. Cousert knew how to make methamphetamine; 4) the five "cooks" produced one or two pounds of methamphetamine; and 5) Mr. Cousert's information was specific enough as to the date of the conspiracy and quantity. Finally, Mr. Reed finds fault with the Probation Officer's reliance on Mr. Cousert's and Ms. McClesky's

---

Reed fails to point to any evidence, and we find none in the record, to show Ms. McClesky is an addict or that the information in her statement was somehow contradictory or unreliable.

Mr. Reed also suggests Mr. Cousert provided contradictory and unreliable evidence because he denied sending a letter to Mr. Reed's sister, which she testified she received from him. We note the letter was not produced at the sentencing hearing. In any event, we leave such credibility determinations to the district court. *See United States v. Nieto*, 60 F.3d 1464, 1469-70 (10th Cir. 1995)*, cert. denied,* 515 U.S. 1081 (1996).

statements in preparing the presentence report.[4]

The principles we must apply for reviewing Mr. Reed's drug quantity argument are well settled. We review the district court's drug quantity determination "under a clearly erroneous standard, and we will not disturb it unless it has no support in the record or unless, after reviewing all the evidence, we are firmly convinced that an error has been made." *See Nieto*, 60 F.3d at 1469. "The quantum of proof necessary to support a drug quantity determination

---

[4] In addition, Mr. Reed contends the district court failed to make a finding on whether Mr. Cousert influenced Ms. McClesky. We assume Mr. Reed's argument stems from Mr. Reed's sister's testimony she received a letter from Mr. Cousert, in which he stated Ms. McClesky would do whatever he did. Regardless of whether Mr. Cousert sent the letter to Ms. Reed, nothing in the record establishes Mr. Cousert ever contacted or influenced Ms. McClesky prior to her making her statement to Agent Payne.

Furthermore, Mr. Reed argues the district court failed to make a requisite finding on whether Mr. Cousert testified against Mr. Reed in exchange for a lighter sentence or to protect himself from statements against his own penal interest. We note Mr. Cousert's statement clearly implicated Mr. Cousert in the conspiracy, and, therefore, was against his own penal interest and had an indicia of credibility. *See United States v. Sporleder*, 635 F.2d 809, 812 (10th Cir. 1980)*; United States v. Hampton*, 633 F.2d 927, 929 (10th Cir 1980), *cert. denied*, 449 U.S. 1128 (1981). Later, when Mr. Cousert testified, he was already serving a fifty-seven-month sentence on the possession charge, and stated he was not receiving any benefit from testifying against Mr. Reed. As recognized by the Seventh Circuit, a co-conspirator's motive for testifying does not necessarily render that testimony inherently unreliable. *See United States v. Edwards*, 115 F.3d 1322, 1331 (7th Cir. 1997). Under the circumstances presented, the credibility of Mr. Cousert's testimony, including his motivation for testifying, was for the district court to evaluate. *Id.* In this case, the district court clearly relied on that testimony and found it credible.

is preponderance of the evidence." *United States v. Ruiz-Castro*, 92 F.3d. 1519, 1534 (10th Cir. 1996). It is well established a district court's use of estimates is an acceptable method for calculating drug quantities, so long as the information underlying those estimates has "a sufficient indicia of reliability." U.S.S.G. § 6A1.3(a); *see also Ruiz-Castro,* 92 F.3d at 1534; *United States v. Browning*, 61 F.3d 752, 754 (10th Cir. 1995). Thus, "[w]e have allowed quantity determinations to be based on a variety of circumstances, so long as they have 'some basis of support in the facts of the particular case.'" *Nieto*, 60 F.3d at 1469 (quotation marks omitted). The drug amount attributable to a defendant for purposes of sentencing is not established by looking at the amount of drugs involved in the conspiracy as a whole, but to the quantity of drugs which he reasonably foresaw and which fell within the scope of his particular agreement with the co-conspirators. *United States v. Ivy*, 83 F.3d 1266, 1289 (10th Cir.), *cert. denied*, 519 U.S. 901 (1996). Finally, we defer to the district court when reviewing the credibility of witnesses on whose testimony the district court relies in making its drug quantity factual findings. *See Nieto*, 60 F.3d at 1469-70.

In this case, the district court clearly made an explicit finding of fact attributing seven kilograms of methamphetamine to Mr. Reed, expressly assessed the witnesses' credibility, and made determinations on the reliability of their

testimony, including Mr. Cousert's memory.  For the following reasons, we conclude sufficient evidence exists in the record to support the reliability of the information and estimates on which the district court based these findings.

We begin with the district court's reliance on Mr. Cousert's statement and testimony.  It is clear the district court was fully aware of Mr. Cousert's prior criminal record, drug dealing, and drug addiction.  Nevertheless, the district court credited his statements on the quantity of methamphetamine involved in the conspiracy, finding Mr. Cousert seemed "to remember fairly well ... what happened."  Thus, contrary to Mr. Reed's contentions, the district court made an explicit finding on whether drug use affected Mr. Cousert's memory.  The reliability of Mr. Cousert's testimony is  demonstrated by the fact it remained consistent with his prior statement to Agent Payne and was corroborated by Ms. McClesky as to one "cook."[5]  As discussed later, the only relevant inconsistency concerns Mr. Cousert's one statement that a couple of the "cooks" he witnessed may have produced only one pound of methamphetamine, instead of two.

In further assessing the district court's reliance on Mr. Cousert's testimony,

---

[5] Unlike the addict-informant in *United States v. Richards*, 27 F.3d 465, 469 (10th Cir. 1994), Mr. Cousert's testimony was not vague, uncorroborated or contradictory.

we also find it irrelevant whether Mr. Cousert knew exactly how to make methamphetamine, or whether he or Mr. Reed actually cut the pure methamphetamine with vitamin B. First, we find nothing in the record indicating Mr. Cousert, and not Mr. Reed, "cut" the methamphetamine with vitamin B during the subject "cooks." Moreover, even if Mr. Cousert "cut" the methamphetamine in issue, his actions in this case are attributable, as a co-conspirator, to Mr. Reed who also participated in the "cooks" which produced the methamphetamine for which Mr. Reed received his conspiracy conviction. *See Ruiz-Castro*, 92 F.3d at 1537-38; *United States v. Kendall*, 766 F.2d 1426, 1431 (10th Cir. 1985), *cert. denied*, 474 U.S. 1081 (1986). Second, while Mr. Cousert admitted he was not an expert in making methamphetamine, it is clear, based on his prior drug use, drug dealing, and participation in the five "cooks," Mr. Cousert had personal knowledge on the basics of making methamphetamine, knew Mr. Reed was manufacturing methamphetamine, and could estimate how much Mr. Reed produced. Under these circumstances, we hold Mr. Cousert's testimony demonstrated "a sufficient indicia of reliability"; therefore, the district court's reliance on it was not clearly erroneous.

In so holding, we reject Mr. Reed's request for this Circuit to adopt a special standard for interpreting addict-witness testimony. In support of his

-13-

request, Mr. Reed relies on four other circuit court cases that held the information provided by a drug addict was unreliable. *See United States v. McEntire*, 153 F.3d 424 (7th Cir. 1998); *United States v. Miele*, 989 F.2d 659 (3d Cir. 1993); *United States v. Simmons*, 964 F.2d 763 (8th Cir.), *cert. denied*, 506 U.S. 1011 (1992); *United States v. Robison*, 904 F.2d 365 (6th Cir.), *cert. denied*, 498 U.S. 946 (1990). Our decision in *Browning* distinguished three of these cases, and no further discussion is warranted other than to say they are distinguishable in this case for the same reasons articulated in that decision. *See* 61 F.3d 755 n.2. As to the other case on which Mr. Reed relies, we similarly find it distinguishable. In *McEntire*, unlike here, the addict-witness admitted his use of methamphetamine affected his memory, lied to benefit himself, and made four different unsupported, uncorroborated drug quantity estimates. 153 F.3d at 437. Given these distinctions, we see no reason, and Mr. Reed has presented no authority, to invent a special standard to assess the reliability of Mr. Cousert's testimony in this case. As stated in *Browning*, we will not second guess the district court's credibility assessment of an addict-witness. *See* 61 F.3d at 754-55.

Turning to the estimated drug quantity attributable to Mr. Reed, we acknowledge the district court made no explicit finding on whether each of the five "cooks" produced one or two pounds of pure methamphetamine. However,

-14-

for the following reasons, the absence of such a finding is harmless error under the circumstances presented in this case.

As background, U.S.S.G. § 2D1.1.(c) provides a Drug Quantity Table for the purpose of determining the base offense level.  It provides for a base offense level of 36 for "[a]t least 5 [kilograms] but less than 15 [kilograms] of Methamphetamine, or at least 1 [kilogram,] but less than 3 [kilograms] of Methamphetamine (actual)."  U.S.S.G. § 2D1.1(c)(2) (1998). [6]  In other words, § 2D1.1(c)(2) provides two ways of calculating the base offense level for methamphetamine convictions.  One method of calculation is based on the quantity of a methamphetamine "mixture," while the other is based on the amount of "pure" methamphetamine contained in that "mixture."  *See Gigley*, 213 F.3d at 518-59.  In determining the base offense level, the sentencing judge must use the greater base offense level – *i.e.*, the greater level resulting from either the weight of the methamphetamine "mixture" or the weight of "pure" methamphetamine contained in that "mixture."[7]  *Id.* at 519.

---

[6]  The 1998 Sentencing Guideline applies to Mr. Reed's 1999 sentence.  Effective November 1, 2000, the amount of "actual" or "pure" methamphetamine was decreased to at least 500 grams, but less than 1.5 kilograms.  *See* U.S.S.G. § 2D1.1(c)(2) (2000) & Dec. 16, 2000 Supp.

[7]  *See* U.S.S.G. § 2D1.1(c) n. (B), which provides:

In this case, even if Mr. Reed produced only one pound of pure methamphetamine[8] during each of the five "cooks," the base offense level of 36 does not change, regardless of whether the drug quantity is based on "pure" methamphetamine or a methamphetamine "mixture." This is because, under a "pure" methamphetamine calculation, it is clear the five pounds of "pure" methamphetamine Mr. Reed manufactured is equal to 2.268 kilograms of "pure" methamphetamine.[9] This amount of "pure" methamphetamine is at least one, but less than three kilograms of "pure" methamphetamine, as required for a base offense level of 36. *See* U.S.S.G. § 2D1.1(c)(2) (Drug Quantity Table) (1998).

Similarly, if we calculate the total methamphetamine "mixture," based on

---

The terms "PCP (actual)" and "Methamphetamine (actual)" refer to the weight of the controlled substance, itself, contained in the mixture or substance. For example, a mixture weighing 10 grams containing PCP at 50% purity contains 5 grams of PCP (actual). In the case of a mixture or substance containing PCP or methamphetamine, use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the PCP (actual) or methamphetamine (actual), whichever is greater.

[8] Applying only one pound per "cook" is a conservative estimate given Ms. McClesky's statement corroborated the fact that at least one of the "cooks" produced two pounds of "pure" methamphetamine.

[9] Because one pound is equivalent to .4536 kilograms, five pounds is 2.268 kilograms. *See* U.S.S.G. § 2D1.1, Appl. n.(10) (Measurement Conversion Table).

the conservative estimate that each "cook" produced only one pound of methamphetamine, Mr. Reed's base offense level remains at 36. This is because five pounds of methamphetamine, mixed at a two-to-one ratio of vitamin B to "pure" methamphetamine results in fifteen pounds, or 6.804 kilograms, of methamphetamine "mixture."[10] Again, this amount is at least five, but less than fifteen kilograms of a methamphetamine "mixture," as required for a offense base level of 36. *See* U.S.S.G. § 2D1.1(c)(2) (Drug Quantity Table) (1998). Thus, under either drug amount calculation, it is clear the quantity of methamphetamine manufactured is within the applicable base offense level of 36, which the district court correctly applied.[11] Obviously, Mr. Reed could reasonably foresee either amount of "pure" or mixed methamphetamine because he directly participated in the five subject "cooks."

---

[10] Five pounds of "pure" methamphetamine combined with ten pounds of vitamin-B results in fifteen pounds of methamphetamine "mixture." Fifteen pounds, at .4536 kilograms per pound, is equivalent to 6.805 kilograms of mixed methamphetamine.

[11] It is unclear from the presentence report how the Probation Officer arrived at a total of 7.07 kilograms of a methamphetamine "mixture." However, despite any perceived error in the Probation Officer's calculation, or the district court's reliance thereon, the error is harmless given the most conservative calculation of only one pound of "pure" methamphetamine for each of the five "cooks" results in a base offense level of 36. *See, e.g., United States v. Humphrey*, 208 F.3d 1190, 1209-10 (10th Cir. 2000) (holding any error in estimate of drug quantity was harmless given the offense level did not change); *Deninno*, 29 F.3d at 579 (same).

Next, sufficient, reliable evidence exists in the record to ascertain the dates on which the methamphetamine "cooks" occurred. In his statement, Mr. Cousert indicated the "cooks" he witnessed occurred between August 1997 and his arrest on February 25, 1998. In Ms. McClesky's statement, she said the "cook" she saw occurred in December 1997. Both of these statements place the conspiracy within the time-frame charged – between January 15, 1997 and February 25, 1998. While neither statement specifies an exact date, they are not so vague nor unreliable to establish the district court erred in relying on them. *See United States v. Smith*, 806 F.2d 971, 973-74 (10th Cir. 1986) (explaining the law of this circuit was reflected in a jury instruction which stated the proof as to a date "need not establish with certainty the exact date of any alleged offense because it [is] sufficient if the evidence in the case established beyond a reasonable doubt that the offense charged [was] committed on dates reasonably near the dates alleged.").

Finally, nothing in the record suggests the Probation Officer's reliance on Mr. Cousert's and Ms. McClesky's statements in preparing her presentence report was unfounded, or that the district court erred in relying on that report. *See United States v. Hershberger*, 962 F.2d 1548, 1555 (10th Cir. 1992). The district court may consider the Probation Officer a reliable source and may determine the

weight given information presented at the sentencing hearing, including the information relied on in the presentencing report and presented at the sentencing hearing. *Id.*

In sum, we hold the information underlying the drug estimates and conspiracy dates had the "sufficient indicia of reliability" necessary to support the district court's finding. *See Browning*, 61 F.3d at 754. Accordingly, the district court's drug quantity calculation resulting in a base offense level of 36 is not clearly erroneous.

## B. Firearm Enhancement

The next argument Mr. Reed presents on appeal concerns the district court's two-level enhancement under U.S.S.G. §2 D1.1(b)(1) for possession of a firearm. Mr. Reed argues the government presented no evidence showing the gun's proximity to the offense. Specifically, Mr. Reed suggests no evidence shows the gun found in his car was "used in the completion of or commission of any drug transaction," or in other words, had "a temporal connection" with any drug transaction.[12]

---

[12] In support, Mr. Reed points out: 1) he was not engaged in a drug transaction when agents arrested him at the convenience store; 2) the addendum to the presentencing report confirms the weapon was not being transported during a drug transaction; 3) Mr.

Sentencing Guideline § 2D1.1 "provide[s] for an offense level enhancement of two points '[i]f a dangerous weapon (including a firearm) was possessed' during a drug conspiracy." *United States v. Vaziri*, 164 F.3d 556, 568 (10th Cir. 1999) (quoting U.S.S.G. § 2D1.1(b)(1)). In determining whether this enhancement is applicable in this case, we review the district court's factual findings for clear error, give due deference to the district court's application of § 2D1.1(b)(1) to the facts, and review purely legal questions *de novo*. *Id.* "The initial burden is on the government to prove possession of the weapon by a preponderance of the evidence, which may be satisfied by showing 'mere proximity to the offense.'" *Humphrey*, 208 F.3d at 1210. "The government's initial burden is met when it shows that a weapon was located near the general location where at least part of the drug transaction occurred." *United States v. Heckard*, ___ F.3d ___, 2001 WL 15532, *8 (10th Cir. Jan. 8, 2001) (quotation marks and citation omitted). "After the government has met this burden, a defendant can still avoid the enhancement if he can prove that it is clearly improbable that the weapon was connected to the offense.... [I]n a drug

Cousert's statement that Mr. Reed flashed the gun and used it to protect his money and drugs was conclusory and unsupported by specific evidence; 4) the presentence report incorrectly stated the government found the gun in the same location where drugs were stored; and 5) no evidence showed the "prior disposition" of the gun, its proximity to the motel room used to make methamphetamine; or that he used it "to protect anything related to the conspiracy that was in his car."

conspiracy conviction, the adjustment should be applied unless it is clearly improbable that the weapon was connected with the conspiracy offense." *Humphrey*, 208 F.3d at 1210.

In this case, Mr. Reed asserts a § 2D1.1(b)(1) firearm enhancement is improper because he was not conducting a "drug transaction" to sell drugs to anyone at the convenience store while he had the gun in his possession. However, the drug offense or transaction for which Mr. Reed was convicted is based on conspiracy to manufacture with intent to distribute methamphetamine; therefore, it is irrelevant whether he sold drugs to anyone at the store.[13] Instead, we may look at the gun's connection to or in proximity with the conspiracy, including the items Mr. Reed used or intended to use to manufacture methamphetamine as part of that conspiracy. *See Humphrey*, 208 F.3d at 1210; *Flores,* 149 F.3d at 1280.

The first instance demonstrating the gun's connection or proximity with the conspiracy involves the actual location of the gun. At the time of his arrest,

---

[13] In support of this conclusion, we point out that § 2D1.1(b) is designed to reflect the increased danger of violence when drug traffickers add firearms to the mix, and that "it is not necessary for the Government to show that drugs and money changed hands near the weapon; the weapon itself may simply serve as a potentially deadly means of protecting the trafficker's goods, thereby increasing the danger of violence." *United States v. Flores,* 149 F.3d 1272, 1280 (10th Cir. 1998), *cert. denied*, 525 U.S. 1092 (1999).

agents found Mr. Reed's gun on the front passenger seat of his car and discovered methamphetamine-making ingredients and equipment in the trunk. This alone is sufficient evidence to show the gun was connected to, or in proximity with, the conspiracy because it establishes a temporal and spacial nexus between the gun in Mr. Reed's car and the drug manufacturing materials found in his trunk. *See Flores*, 149 F.3d at 1280.

The record also clearly shows that on the day of his arrest, Mr. Reed conspired to participate in the manufacture of methamphetamine in the motel room where agents arrested Mr. Cousert and Ms. McClesky and found large quantities of methamphetamine-making equipment and ingredients. Strong circumstantial evidence, including Mr. Reed's possession of the motel room key, suggests he was transporting himself, and the equipment, ingredients, and gun, to the motel as part of this continuing conspiracy. Given these facts, Mr. Reed fails to demonstrate it is "clearly improbable that the gun was connected to the conspiracy." *Humphrey*, 208 F.3d at 1210.

Finally, Mr. Cousert testified his co-conspirator, Mr. Reed, usually carried a gun for protection of his money and drugs. This statement indicates Mr. Reed possessed a firearm during the conspiracy between Mr. Cousert and Mr. Reed to

manufacture methamphetamine. Based on all the facts presented, Mr. Reed

plainly fails to carry his burden in proving it was "clearly improbable that the gun

was connected the conspiracy."[14] *Id.* Accordingly, we conclude the district court

did not err in applying the two-level firearm enhancement in calculating Mr.

Reed's sentence.

## C. *Apprendi* Argument

Mr. Reed's final argument is based on the United States Supreme Court's

decision in *Apprendi v. United States*. He raised this argument for the first time

during oral argument.[15] Mr. Reed contends his 168-month sentence is illegal

under *Apprendi* because the indictment charged him with 100 grams or more of

---

[14] While Mr. Reed's argument on appeal is devoid of any discussion of the other handgun involved in this case, evidence shows agents discovered a .9mm handgun in his home as well as various drug-making paraphernalia and ingredients used to make methamphetamine. Mr. Cousert testified four of the "cooks" in which he participated occurred at Mr. Reed's home in Truth or Consequences and that Mr. Reed usually carried a gun for protection of his money and drugs. This evidence indicates Mr. Reed possessed a firearm during their conspiracy together to manufacture methamphetamine, and thus, the handgun found in his residence both corroborates this evidence and supports the firearm enhancement. In sum, it shows "a weapon was located near the general location where part of the conspiracy occurred." *Heckard*, ___ F.3d at ___, 2001 WL 15532, at *8.

[15] Because the Supreme Court's *Apprendi* decision post-dated Mr. Reed's notice of appeal, we granted Mr. Reed permission to file a supplemental brief outlining his *Apprendi* argument, and provided the government an opportunity to respond thereto.

methamphetamine, while the drug quantity element was "left open and disputed in [his] plea agreement." Because he "never acceded to possession of any amount," he contends no constitutional basis existed for sentencing him for "possession" of over 100 grams without a trial by jury and a finding of possession with intent to distribute beyond a reasonable doubt. Mr. Reed also suggests the maximum penalty he faced was "nebulous" because if he was found guilty of "possessing" less than 100 grams, he could have faced a sentence of five-to-forty years under § 841(b)(1)(B)(viii), but if it was in excess of 100 grams, he faced a sentence of ten years-to-life in prison under § 841(b)(1)(A). Consequently, he contends he never received "notice" of the maximum statutory amount applicable to him because it "not determined with any specificity in the plea agreement." Mr. Reed also claims his sentence is void under *Apprendi* because his possession of a firearm was not charged in the indictment nor proven beyond a reasonable doubt to a jury. After a review of the record, we conclude Mr. Reed fails to present a colorable *Apprendi* claim.

We review Mr. Reed's *Apprendi* argument for plain error. *See United States v. Keeling*, 235 F.3d 533, 538 (10th Cir. 2000). As in this case, "[w]here the law was settled at the time of trial, [but] clearly contrary to the law on appeal," a plain-error standard of review is applied. *Id.* "To notice plain error

-24-

under [Federal Rule of Criminal Procedure] 52(b), the error must (1) be an actual error that was forfeited; (2) be plain or obvious; and (3) affect substantial rights." *Id.* To affect a defendant's substantial rights, "the error must be prejudicial, *i.e.* it must have affected the outcome of the trial."[16] *Id.* Prejudice in sentencing may occur if "the alleged error resulted in an increased sentence for the defendant." *United States v. Meshack*, 225 F.3d 556, 577 (5th Cir. 2000), *cert. denied*, 121 S. Ct. 834 (2001). Finally, "an appellate court should exercise its discretion and notice such error where it either (a) results in the conviction of one actually innocent, or (b) seriously affects the fairness, integrity or public reputation of judicial proceedings." *Keeling*, 235 F.3d at 538 (quotation marks, alteration, and citations omitted).

With this standard of review in mind, we consider the basic principle set forth in *Apprendi*. In short, the Court in *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 120 S. Ct. at 2362-63. We and our sister circuits have

---

[16] Similarly, the United States Supreme Court has instructed that any error in submitting an element of an offense to a judge and not a jury for determination, is subject to a harmless error analysis to ascertain if the defendant's substantial rights were affected. *See Neder v. United States*, 527 U.S. 1, 9-10 (1999).

determined *Apprendi* applies to 21 U.S.C. § 841(b).  *See Keeling*, 235 F.3d at 538(referring to numerous other circuit court decisions holding the same). Specifically, § 21 U.S.C. § 841(b) is a penalty statute, which expressly prescribes different terms of imprisonment under subsections (A)-(D).  Subsection (C) of § 841(b)(1) is a catch-all provision for any quantity of Schedule I or II drugs, and does not require the amount of the drug charged to be proven.  *See United States v. Rogers*, 228 F.3d 1318, 1327 n.15 (11th Cir. 2000).  However, the remaining subsections – (A), (B) and(D)–prescribe penalties based on specifically enumerated drug quantity amounts.  *See United States v. Shepard*, 235 F.3d 1295, ___, 2000 WL 1839206, at *1 (11th Cir. Dec. 14, 2000).  Because convictions under these subsections can expose a defendant to a term of imprisonment greater than the statutory maximum of twenty years prescribed under § 841(b)(1)(C), drug quantity is considered an element in each of them.  *Id.* For that reason, numerous circuits have determined that in sentencing defendants under these statutes, the drug quantity must be charged in the indictment,[17] explicitly set out in jury

---

[17]  *See Rogers*, 228 F.3d at 1327; *Shepard*, ___ F.3d at ___, 2000 WL 1839206, at *1.

instructions,[18] and proven to a jury beyond a reasonable doubt.[19]

With these principles in mind, we begin our *Apprendi* analysis by reviewing the content of the indictment. In this case, the superseding indictment for Count I charged that Mr. Reed did "conspire ... [t]o manufacture and possess with intent to distribute 100 grams and more of methamphetamine ... a Schedule II controlled substance, contrary to 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(A) [i]n violation of 21 U.S.C. § 846 and 18 U.S.C. § 2." The 1998 version of § 841(b)(1)(A), as charged in the superseding indictment, sets the length of imprisonment at not less than ten years or more than life for manufacturing 100 grams or more of pure methamphetamine. *See* 21 U.S. C. § 841(b)(1)(A)(viii) (1998).[20]

Under the circumstances presented, nothing in the indictment is nebulous.

_____

[18] *See United States v. Slaughter*, ___ F.3d ___, ___, 2000 WL 1803643, at *3 (5th Cir. Dec. 8, 2000).

[19] *See Slaughter*, ___ F.3d at ___, 2000 WL 1803643, at *3; *Shepard*, ___ F.3d at ___, 2000 WL 1892-6, at * 1.

[20] The 100 grams or more amount applies to the 1998 version of the statute. The current version of § 841(b)(1)(A) is more severe, requiring only an amount of 50 grams or more of "pure" methamphetamine for a maximum term of imprisonment of life. *See* 21 U.S.C. § 841(b)(1)(A) (2000).

Mr. Reed was clearly on notice of the type and quantity of drug for which he was charged as well as the maximum penalty he faced – namely, life in prison. The indictment further identified the offense charged, *i.e.*, participation in a conspiracy to manufacture and possess with intent to distribute methamphetamine. In sum, the indictment gave Mr. Reed notice of: 1) the nature and cause of the accusation against him, and 2) all the elements to be proven for conviction. *See Shepard*, ___ F.3d at ___, 2000 WL 1839206, at *1. Thus, the indictment did not contain an "actual error" that was "plain or obvious." *See Keeling*, 235 F.3d at 538. Consequently, when Mr. Reed pled guilty to the conspiracy, but challenged the amount charged, he knew the government would attempt to prove the drug quantity charged in the indictment, and if so, he could face life in prison. Hence, Mr. Reed received sufficient notice. Thus, he cannot show he experienced any prejudice based on the indictment alone.

We next turn to Mr. Reed's argument that the district court erred in allowing him to plead guilty because *Apprendi* requires a jury determination on the drug quantity element. In applying plain error analysis to a similar challenge, we articulated the defendant's burden in showing an *Apprendi* violation. We stated that "[w]here the jury has not found quantity beyond a reasonable doubt and quantity is integral to punishment, a defendant can demonstrate prejudice if

the evidence suggests a reasonable doubt on quantity." *Keeling*, 235 F.3d at 538.

In this case, even if *Apprendi* requires a jury determination on the drug quantity attributable to Mr. Reed,[21] he fails to carry his burden of demonstrating the requisite prejudice. This is because the evidence does not suggest a reasonable doubt as to quantity. Instead, as previously discussed, the evidence strongly shows Mr. Reed participated in five "cooks" manufacturing at least one pound of "pure" methamphetamine at each. The result is a total of 2.268 kilograms or 2,268 grams of "pure" methamphetamine. This is obviously more than 100 grams of "pure" methamphetamine, as alleged in the indictment and charged under § 841(b)(1)(A)(viii). Given the overwhelming evidence in this case as to quantity, Mr. Reed has not shown that any perceived error, in not submitting the drug quantity issue to a jury for determination, prejudiced him

---

[21] Because it is unnecessary to the disposition of this case, we do not decide whether the *Apprendi* decision requires a jury determination in a case, like here, where the defendant pled guilty with full knowledge of all the elements of the crime charged. While we acknowledge this case is similar to *Apprendi* because both defendants pled guilty to the charges against him, this case is different because the indictment at issue here clearly set forth all of the elements of the offense charged. *See* 120 S. Ct. at 2352. Thus, when Mr. Reed pled guilty in this case, he expressly waived his right to trial knowing the drug quantity charged, and clearly consented to a determination of drug quantity at an evidentiary hearing. Consequently, it appears Mr. Reed made a voluntary and informed decision to let the trial court be the trier of fact, rather than a jury, in determining the contested drug quantity.

under our plain error analysis. Moreover, Mr. Reed faced a maximum sentence of life in prison under § 841(b)(1)(A), as charged in the indictment. However, the district court sentenced him to a lesser sentence of fourteen years imprisonment. Mr. Reed has not shown how failure to submit the drug quantity issue to a jury would have resulted in a lesser sentence. *Meshack*, 225 F.3d at 577. The same is true with respect to Mr. Reed's sentence of five years supervised release. This is because § 841(A) requires a term of supervised release of at least five years and § 841(C) requires a term of supervised release of at least three years. *See* 21 U.S.C. §§ 841(A), 841(C). The maximum term of supervised release under either is life. *See United States v. Aguayo-Delgado*, 220 F.3d 926, 933 (8th Cir.) (holding the minimum term of supervised release the defendant faced under § 841 (C) was life), *cert. denied*, 121 S. Ct. 600 (2000). Mr. Reed has not shown how submitting the drug quantity issue would have resulted in fewer years of supervised release.[22] Thus, Mr. Reed has shown no prejudice resulting from the

---

[22] In this case the government first "conceded" the district court erred under *Apprendi* in sentencing Mr. Reed to five years supervised release because this term "is greater than the lowest statutory maximum sentence." Apparently, the government was relying on 18 U.S.C. § 3583(b), which provides for a maximum term of supervised release of three years. The government then suggested no plain error was committed because the evidence showed the drug quantity was sufficient for conviction under § 841(A) which allows for five years supervised release. In filing its supplemental authorities, the government retracts its concession, recognizing this Court has held § 3583(b)(2) does not limit § 841(C). *See Heckard*, ___ F.3d at ___, 2001 WL 15532, at *12; *United States v. Orozco-Rodriguez*, 60 F.3d 705, 707-08 (10th Cir. 1995). Accordingly, the government now asserts Mr. Reed does not present a colorable *Apprendi*

district court, and not a jury, determining the drug quantity.[23]

Finally, Mr. Reed presents no colorable *Apprendi* claim concerning his firearm sentencing enhancement.  *Apprendi* is not implicated because the firearm enhancement did not expose him to a greater punishment than authorized by statute.  *See United States v. Hernandez-Guardado*, 228 F.3d 1017, 1027 (9th Cir. 2000).  Specifically, Mr. Reed's 168-month (or fourteen-year) term of imprisonment imposed by the district court is less than the maximum sentence of life under § 841(b)(1)(A), as alleged in the indictment.  It is also less than the maximum sentence of twenty years under the less stringent penalty statute,

---

claim.  We agree.

[23] Because the indictment charged Mr. Reed under 21 U.S.C. § 841(b)(1)(A), we have conducted a plain error analysis under that statute.  However, we note the district court actually sentenced Mr. Reed under the less onerous penalty statute, § 841(b)(1)(C), which does not require a quantity determination.  Even if we applied § 841(b)(1)(C) in our analysis, Mr. Reed presents no colorable *Apprendi* claim.  This is because a sentence is valid, even if the drug quantity is not charged in the indictment nor proven to a jury, so long as it does not exceed the statutory maximum sentence allowed under § 841(b)(1)(C) for Schedule I and II drugs.  *See United States v. Keith*, 230 F.3d 784 (5th Cir. 2000), *petition for cert. filed*, (U.S. Jan. 16, 2001) (No. 00-8077); *United States v. Doggett*, 230 F.3d 160, 165 (5th Cir. 2000), *petition for cert. filed*, (U.S. Jan. 4, 2001) (No. 00-7819); *Aguayo-Delgado*, 220 F.3d at 934.  We note methamphetamine is considered a Schedule II drug for the purpose of applying § 841(b)(1)(C), *see United States v. Killion*, 7 F.3d 927, 935 (10th Cir. 1993), *cert. denied*, 510 U.S. 1133 (1994), and the maximum sentence for an undetermined quantity of methamphetamine is twenty years imprisonment.  *See* § 841(b)(1)(C).  Thus, if we consider Mr. Reed's sentence under § 841(b)(1)(C), as applied by the district court, his fourteen-year sentence is less than the twenty-year maximum sentence under § 841(b)(1)(C), and therefore, not invalid under *Apprendi*.

§ 841(b)(1)(C), used for an undetermined quantity of methamphetamine and applied by the district court in sentencing Mr. Reed. For these reasons, no *Apprendi* claim is implicated in Mr. Reed's case.

## III. CONCLUSION

For the reasons set forth above, we reject Mr. Reed's challenge to the reliability of the evidence supporting the district court's drug quantity determination, application of the firearm enhancement, and his contention his sentence is unconstitutional under *Apprendi*. Accordingly, we **AFFIRM** his conviction and sentence.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge